IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

SHELLY D. ROSS,                       )
                                      )
            Plaintiff,                )
                                      )
                                      )        CIV-05-476-M
v.                                    )
                                      )
JO ANNE B. BARNHART,                  )
  Commissioner of Social Security     )
  Administration,                     )
                                      )
            Defendant.                )

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of

Defendant Commissioner denying her application for disability insurance benefits under Title

II of the Social Security Act, 42 U.S.C. §§ 416(i), 423.   Defendant has answered the

Complaint and filed the administrative record (hereinafter TR___).   The parties have briefed

the issues, and the matter has been referred to the undersigned Magistrate Judge for initial

proceedings consistent with 28 U.S.C. § 636(b)(1)(B).   For the following reasons, it is

recommended that the Commissioner's decision be affirmed.

I. Background

Plaintiff filed her application for benefits on June 4, 2002 (protective filing date

February 7, 2002), alleging she became disabled on July 7, 2001, due to headaches, shoulder

pain, "trouble writing," and the side effects of medications. (TR 47, 50-52, 61). Plaintiff was

insured for the purpose of her application for Title II benefits only until September 30, 2003. (TR 58). Therefore, Plaintiff must prove she became disabled prior to the expiration of her insured status on September 30, 2003. Adams v. Chater, 93 F.3d 712, 714 (10th Cir. 1996); Henrie v. United States Dep't of Health & Human Servs., 13 F.3d 359, 360 (10th Cir. 1993); Potter v. Secretary of Health & Human Servs., 905 F.2d 1346, 1349 (10th Cir. 1990)(*per curiam*).

Plaintiff's application was administratively denied. (TR 27, 28). At Plaintiff's request, a hearing *de novo* was conducted before Administrative Law Judge Vanderhoof ("ALJ") on October 24, 2003, at which Plaintiff testified. (TR 240-257). Subsequently, the ALJ issued a decision in which the ALJ found that Plaintiff has a combination of severe impairments due to right shoulder surgery and "a recent EMG study [which] yielded findings consistent with an L5 radiculopathy." (TR 17-18). The ALJ further found that these impairments were not so severe as to be disabling *per se* under the agency's Listing of Impairments and that despite these impairments Plaintiff retains the functional capacity, otherwise known as residual functional capacity ("RFC"), to perform the requirements of sedentary work. (TR 18-19). In light of this RFC for work and Plaintiff's description of her past work as a secretary, the ALJ concluded that Plaintiff is not disabled within the meaning of the Social Security Act because she retains the capacity to perform her previous secretarial job. (TR 19-21). Plaintiff's administrative appeal of this decision was rejected by the Appeals Council (TR 5-7). Plaintiff now seeks judicial review of the final decision of the Commissioner embodied in the ALJ's determination.

2

Plaintiff contends that the ALJ erred in failing to give controlling weight to her treating doctor's findings with respect to her RFC for work, in failing to credit Plaintiff's testimony regarding her ability to sit, and in failing to obtain expert vocational testimony with respect to the availability of jobs given Plaintiff's testimony regarding her limited ability to sit.  Defendant Commissioner responds that no error occurred with regard to the ALJ's evaluation of the evidence and that substantial evidence in the record supports the Commissioner's decision, which should be upheld.

## II. Standard of Review

Judicial review of this Complaint is limited to determining whether the Commissioner's decision is based upon substantial evidence and whether the correct legal standards were applied.  Emory v. Sullivan, 936 F.2d 1092, 1093 (10th Cir. 1991).  The court will look to the record as a whole to determine whether the evidence which supports the Commissioner's decision is substantial in light of any contradicting evidence.  Nieto v. Heckler, 750 F.2d 59, 61 (10th Cir. 1984); Broadbent v. Harris, 698 F.2d 407, 412 (10th Cir. 1983)(per curiam).  If the Commissioner fails to apply the correct legal standard or substantial evidence does not support the Commissioner's decision, the court may reverse the Commissioner's findings. Byron v. Heckler, 742 F.2d 1232, 1235 (10th Cir. 1984)(per curiam).  The court may not reweigh the evidence or substitute its judgment for that of the Commissioner.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1498 (10th Cir. 1992). To find that the Commissioner's decision is supported by substantial evidence in the record, there must be sufficient relevant evidence in the record that a reasonable person

might deem adequate to support the ultimate conclusion.  Bernal v. Bowen, 851 F.2d 297, 299 (10th Cir. 1988).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §416(i).  The Commissioner applies a five-step inquiry to determine whether a claimant is disabled.  See 20 C.F.R. §404.1520(b)-(f) (2005); see also Williams v. Bowen, 844 F.2d 748, 750-752 (10th Cir. 1988)(describing five steps in detail).  The claimant bears the initial burden of proving that she has one or more severe impairments.  20 C.F.R. §404.1512 (2005); Turner v. Heckler, 754 F.2d 326, 328 (10th Cir. 1985).  Where the plaintiff makes a *prima facie* showing that she can no longer engage in prior work activity, the burden of proof shifts to the Commissioner to show "the claimant retains the capacity to perform an alternative work activity and that this specific type of job exists in the national economy." Turner v. Heckler, 754 F.2d at 328; Channel v. Heckler, 747 F.2d 577, 579 (10th Cir. 1984).

III. Medical Record

A comprehensive review of the medical record in this case is necessary for proper resolution of the issues presented by the parties.  The medical record contains office notes from Dr. Bentley indicating he began treating Plaintiff in January 2001.  On January 2, 2001, Plaintiff complained of a headache beginning December 22, 2000, that was so severe she felt her head would "explode." (TR 187).  Dr. Bentley ordered a magnetic resonance imaging

4

("MRI") test of Plaintiff's head for her "unrelenting cephalgia." (TR 187).  The MRI scan of Plaintiff's brain conducted the following day was normal. (TR 186).  On February 14, 2001, Plaintiff returned to Dr. Bentley, again complaining of a headache and also complaining of right shoulder pain which she described as ongoing pain radiating into her neck and down her right arm, and pain with turning her head from side to side. (TR 183).  Dr. Bentley prescribed pain and anti-nausea medication and referred Plaintiff to a physical therapist. (TR 183).   There is one note of a physical therapy evaluation of Plaintiff on February 20, 2001. (TR 181-182).  On February 20, 2001, Dr. Bentley authored a letter addressed "To Whom It May Concern" in which the physician stated that Plaintiff had been injured on September 24, 1997, "while lifting a patient" during her employment at a hospital, that she had complained on January 2, 2001, of "headache, right shoulder pain and neck pain that extends down the right arm," and that this "worsening condition is related to this injury." (TR 180).  On March 12, 2001, Plaintiff again complained to Dr. Bentley of right shoulder and right-sided neck pain, for which anti-depressant and anti-nausea medication was prescribed. (TR 179).  Dr. Bentley advised Plaintiff to see a specialist. (TR 179).

Dr. Bentley referred Plaintiff to Dr. Covington, a neurosurgeon, who evaluated Plaintiff and reported to Dr. Bentley in a letter dated April 5, 2001, that Plaintiff stated she injured her shoulder in 1997 and had arthroscopic surgery on her shoulder for this injury, that she had continuing and worsening pain in her shoulder and right arm accompanied by severe right-sided headaches and right-sided paracervical pain, and pain down the back of the arm with numbness in her fingers. (TR 135).  Dr. Covington noted Plaintiff also described low

5

back pain and that her legs will "go out from under her on occasion when she is going up or down stairs." (TR 135).   Dr. Covington noted that following Plaintiff's injury she was extensively evaluated, including "normal" electromyogram ("EMG") studies, "normal" brain MRI scan, "normal" thoracic spine MRI scan, "normal" cervical spine MRI scan, and lumbar spine MRI scan showing only "modest changes." (TR 135).   Dr. Covington noted that on physical examination Plaintiff exhibited "give away weakness" in all motor groups in her right upper extremity, pain in and about the trapezii and shoulder, and impaired range of motion in her cervical spine. (TR 135).   With respect to her lumbar spine, Dr. Covington noted Plaintiff "move[d] with ease in and out of the chair and on and off the examination table and while observed ambulating the halls." (TR 135-136).   She also showed no muscular atrophy or neurological deficits. (TR 136).   Dr. Covington prescribed non-narcotic pain and sleeping aid medications and arranged for new MRI and EMG studies. (TR 136).   The MRI scan of Plaintiff's cervical spine and shoulder and the EMG and nerve conduction velocity studies were interpreted by Dr. Covington as being normal.   Following these studies, Dr. Covington advised Plaintiff in May 2001 that she apparently has a chronic pain syndrome with no surgically-correctable pathology. (TR 134).   Dr. Covington recommended a "pain management consultation." (TR 134).

On May 21, 2001, Plaintiff returned to Dr. Bentley, and the physician noted she was "still" complaining of headache, right shoulder, neck, and back pain. (TR 176).   Dr. Bentley diagnosed Plaintiff with chronic pain and referred her for consultative evaluation to Dr. Paige. (TR 176).   Dr. Paige notified Dr. Bentley by letter that he evaluated Plaintiff and his

diagnosis was a "complex regional pain syndrome of the right arm and shoulder [due] to a brachial plexus stretch injury..." (TR 123).  Dr. Paige noted he had discontinued two of Plaintiff's medications and had prescribed non-narcotic pain and muscle relaxant medications and scheduled Plaintiff for dorsal root nerve block injections on the right at three cervical levels. (TR 123).  In a hand-written note on Dr. Bentley's prescription notepad dated July 6, 2001, Dr. Bentley stated that Plaintiff "needs to be off work until further notice due to headaches, neck [and] shoulder pain, and the medication she is on for them." (TR 172).

The record contains an extensive report of an independent consultative examination of Plaintiff for the workers' compensation court by Dr. Al Moorad, the medical director of a rehabilitation hospital, an outpatient rehabilitation clinic, and a pain management center in Oklahoma City. (TR 113-119).  The report indicates that Plaintiff was examined on August 27, 2001, with respect to her workers' compensation claim in which she alleged she had suffered a change of condition for the worse from the date of her last ordered award of work-related injury compensation benefits. (TR 113).  Dr. Moorad notes that he had reviewed all of Plaintiff's medical records and x-rays available to him in making the report and had conducted a three-phase bone scan and battery of lab testing.  According to Dr. Moorad's report, Plaintiff gave a history of a previous injury to her right shoulder and low back while lifting a patient, subsequent surgical decompression, and a subsequent return to full-time work in an office job as a unit coordinator. (TR 113).  However, Plaintiff described chronic pain and headaches "for years" and a change in her condition as her pain had recently worsened, her headaches increased, and she was experiencing a good deal of pain in her right

paracervical spine, in her right trapezius muscles, in her right scapula and arm, and pain with numbness down her right arm to her right fingers, as well as "off and on" low back pain. (TR 113-114).   Dr. Moorad noted that Plaintiff stated her pain level was 10 on a scale of 0 to 10 and that any exertional activity, including coughing, increased her pain, although she also stated that her pain level went down to 7 or 8 after Dr. Bentley prescribed pain medications and after she stopped working in July 2001. (TR 114-115).

On physical examination, Dr. Moorad noted Plaintiff walked with a normal gait, her neck and cervical spine showed some tenderness but she was able to move her neck during the examination without difficulty, she exhibited shoulder muscle tenderness but she did not have the trigger points expected in fibromyalgia, she exhibited mild tenderness in her upper thoracic spine area but normal range of motion in her thoracic spine, she exhibited mild tenderness in the mid to lower lumbar area and tenderness over her biceps and triceps tendon in her right shoulder without crepitation, coolness, discoloration, or edema, and she exhibited diffuse tenderness of the right wrist and hand.   (TR 116-117).   Dr. Moorad noted a neurological examination was normal, the three-phase nuclear bone scan was normal, her lab tests were normal, a sedimentation rate test was normal, and blood count, lupus, and rheumatoid tests were all normal. (TR 117).   Based on this examination and testing and the physician's review of Plaintiff's previous EMG and MRI tests, Dr. Moorad concluded that Plaintiff had no objective or subjective evidence of reflex sympathetic dystrophy, complex regional pain syndrome, or fibromyalgia, that her condition had not changed for the worse, and that "there is no reason for her not to be performing her office work like she was earlier

this year." (TR 118).  Dr. Moorad stated that his diagnosis was chronic myofascial pain syndrome "which she had for years, with chronic headaches," that no further medical assessment or treatment was necessary, and that "this is only a chronic condition that she should learn how to live with and avoid narcotics." (TR 118).  Dr. Moorad also advised that Plaintiff "continue treatment with her physician, as she had done before, with taking no narcotic medication for her headaches, doing a regular exercise program for stretching of her neck and right upper extremity, doing low back exercises on a regular basis," taking over-the-counter anti-inflammatory agents, treating with ice or heat, and using over-the-counter topical theragesic medication "when she has the discomfort for her chronic condition, which she has had for years." (TR 118).

Plaintiff returned to Dr. Paige on October 30, 2001, who noted that he reviewed Dr. Moorad's report and disagreed with the conclusions in the report as he thought Plaintiff has a "complex regional pain syndrome Type I related to her brachial plexus stretch injury." (TR 121).  Dr. Paige noted Plaintiff's statement that the non-narcotic medication she was using was beneficial and that he performed dorsal nerve root block injections at three cervical levels. (TR 121-122).  Dr. Paige suggested increasing the Plaintiff's non-narcotic pain medication, adding a very small dose of narcotic pain medication, and increasing the muscle relaxant medication. (TR 122).  The physician also stated that Plaintiff should try to return to work and that her condition would not totally limit her from working at a sedentary job. (TR 122).  Approximately one month later, after Plaintiff returned to Dr. Paige for follow-up consultative examination and reported that the previous nerve root injections provided

"benefit for little less than a week," Dr. Paige stated that because of the brevity of his contacts with Plaintiff he was not certain she would be able to return to work. (TR 120).  Dr. Paige suggested Plaintiff return for further pain management treatment and continue taking two daily small dosages of a narcotic pain medication, oxycodone. (TR 120).

In November 2001, Dr. Bentley advised the workers' compensation court that Plaintiff's condition was clinically "worsening," that she needed further medical treatment, that she had been referred to Dr. Paige for an epidural spinal steroid injection "which seems to have helped," and she needed to follow-up with Dr. Paige "as he sees medically necessary." (TR 168).   In December 2001, Dr. Bentley's office notes reflect that he prescribed non-narcotic and narcotic pain medications, muscle relaxant and anti-depressant medications, and physical therapy for Plaintiff's back. (TR 167).   In January 2002, Plaintiff returned to Dr. Bentley complaining of severe headache, blurred vision, and body ache, especially in her lower back, dysuria, and a "sore spot on back of hand." (TR 164).   Dr. Bentley noted he provided samples of a bladder control medication. (TR 164).    The following day, Plaintiff returned to Dr. Bentley and stated she had "good days" and "bad days" and that she was considering the pain management treatment recommended by Dr. Paige. (TR 163).   Dr. Bentley noted he prescribed a three week trial of another low-dosage narcotic pain medication. (TR 163).   In March 2002, Plaintiff complained to Dr. Bentley of a swollen and red right eye, worsening back pain, constant sleepiness, and right shoulder heaviness. (TR 160).   Dr. Bentley noted Plaintiff described symptoms of narcolepsy, but no other diagnosis or treatment was noted. (TR 160).   On March 27, 2002, Plaintiff returned to

10

Dr. Bentley complaining of constant neck, back, and right shoulder pain, and that the narcotic medication previously prescribed was "too strong for daytime." (TR 159). No treatment or diagnosis is indicated other than "chronic neck/nerve pain." (TR 159).

On May 14, 2002, Plaintiff returned to Dr. Bentley, complaining of nausea and headache and seeking a "letter about injuries [and] inability to work." (TR 156). Plaintiff also complained of leg pain and easy bruising. Dr. Bentley noted he was considering obtaining an ultrasound of Plaintiff's gallbladder and that he prescribed non-narcotic pain medication and anti-nausea medication. (TR 156). In June 2002, Dr. Bentley noted Plaintiff returned, complaining of joint and bilateral knee pain, right shoulder pain, nausea with eating, and stated she had "slept most of week-end" and "ran out of [prescription] med[ications] last Friday." (TR 154). Dr. Bentley prescribed three different narcotic pain medications, all containing oxycodone, and a non-narcotic pain medication. (TR 154). In June 2002, Dr. Bentley referred Plaintiff to Dr. Barnhill, an orthopedic surgeon for evaluation. Dr. Barnhill's report of his examination of Plaintiff indicates that based on an interview and physical examination he suspected a rotator cuff impingement with either secondary fibromyalgia or superomedial angular scapular syndrome, and he recommended an MRI scan of her right shoulder. (TR 148-149). Following the MRI scan, Plaintiff returned to Dr. Barnhill, who noted that the MRI scan did not show evidence of a rotator cuff tear but that Plaintiff exhibited significant tenderness at the superomedial angle of the scapula, for which he recommended an injection. (TR 147). Dr. Barnhill recommended a consultative evaluation of Plaintiff by Dr. Hulsey for possible fibromyalgia. (TR 147).

In October 2002, Dr. Bentley authored a letter addressed "To Whom It May Concern" in which he stated that he saw Plaintiff on September 12, 2002, for her complaints of headaches, right shoulder pain, and neck pain extending down her right arm, difficulty with her thyroid and bowels, fatigue, and adverse effects of medications. (TR 153). The letter provides no diagnosis but clarifies that he had prescribed for Plaintiff one narcotic pain medication containing oxycodone for daily use, two narcotic pain medications containing oxycodone for use "as needed," a non-narcotic pain medication, an anti-depressant medication, and a medication for thyroid imbalance. Dr. Bentley stated that Plaintiff's unidentified "condition is worsening" and she is "unable to work" due to her "medical problems and medications." (TR 153).

Plaintiff filed her application for benefits in June 2002, and with her application she described previous work as a secretary, hospital ward clerk, waitress/cashier, and butcher/cashier. (TR 70). Plaintiff stated that she spends her days mostly "sitting" with some housecleaning, laundry, dishwashing, dusting, grocery shopping, cooking, and television watching activities. (TR 82-85). Plaintiff stated that she visits friends or relatives one to two times a month for three to five days at a time and that she can drive. (TR 86). Plaintiff described constant pain in her head, shoulder, and back, caused by using her right arm, damp weather, sitting in one position for an hour or so, pushing, pulling, or reaching, occurring for one and a half years, and partially relieved by medications and hot baths. (TR 89-90). Plaintiff stated that medications she was "taking now" for pain included three narcotic pain medications, two of which she was taking two to three times a day, two non-narcotic pain

medications, a muscle relaxant, and anti-nausea, bladder control, anti-inflammatory, allergy, and thyroid imbalance medications.  (TR 88-90).

With Plaintiff's request for an administrative hearing, Plaintiff stated she was having "more trouble with my legs, especially when I first get up" and that it took her two or three hours each day before she could move around. (TR 97).  At the time she requested her hearing, Plaintiff stated she was taking three narcotic pain medications containing oxycodone two to three times per day and a non-narcotic pain medication three times each day. (TR 99). At the time of her hearing in October 2003, Plaintiff stated she was "presently taking" three narcotic pain medications containing oxycodone one to three times each day and a non-narcotic pain medication three times each day, as well as anti-depressant and thyroid imbalance medications. (TR 102).

Dr. Bentley's office records indicate that in February 2003, Plaintiff's current medications included one narcotic pain medication containing oxycodone two times a day, another smaller dosage of narcotic pain medication containing oxycodone as needed, a non-narcotic pain medication, and an anti-depressant medication.  At that time, Dr. Bentley noted Plaintiff complained of dizziness for which anti-anxiety medication was prescribed. (TR 225).  In March 2003, Dr. Bentley noted he discontinued the anti-depressant medication after Plaintiff complained of constant nausea. (TR 223).  Dr. Bentley's office records reflect that in April, May, and June of 2003, Plaintiff sought treatment for weakness in her legs, muscles, and arms. (TR 220-222).  Dr. Bentley noted in June 2003 that nerve conduction velocity studies of Plaintiff's lower extremities had been scheduled, and he noted "weakness" in

Plaintiff's legs as his only objective clinical finding. (TR 219).

In September 2003, Dr. Bentley authored another letter addressed "To Whom It May Concern" in which the physician stated he had seen Plaintiff on September 12, 2003, for her complaints of headaches, right shoulder, and neck pain extending down her right arm, low back pain, and "trouble with her legs." (TR 218).  Although this letter contains no definitive diagnosis, Dr. Bentley states that Plaintiff's medications "make her very tired and sleep [sic]," that in his medical opinion her unidentified "condition is worsening," that she is "unable to work," and that she "has been disabled since July 2, 2001." (TR 218).   A report authored by Dr. Murati dated September 2, 2003, reflects that nerve conduction velocity and EMG tests were conducted of Plaintiff's legs and the testing was consistent with a right-sided radiculopathy. (TR 228-231).  The record also contained an RFC assessment of Plaintiff's ability to work submitted by Dr. Bentley dated October 8, 2003. (TR 232-234).

IV. Treating Physician's Opinion

Plaintiff contends that the ALJ erred in failing to give controlling weight to the opinion of Plaintiff's treating physician, Dr. Bentley, with respect to Plaintiff's RFC for work.  The Plaintiff's brief is deficient in that it fails to refer to specific pages in the administrative record.  However, it appears Plaintiff is referring to the RFC assessment prepared by Dr. Bentley in October 2003.  In this RFC assessment, Dr. Bentley found that Plaintiff has the RFC to sit for less than six hours in an eight-hour work day.  This finding is not consistent with the ability to perform sedentary work, which generally requires sitting for a total of six hours in an eight-hour work day. SSR 96-9p, 1996 WL 374185, * 3, * 6

(July 2, 1996).  Additionally, Plaintiff contends that the ALJ erred in giving controlling weight to the opinion by Dr. Moorad, rather than the opinion by Dr. Bentley, because Dr. Moorad was not a treating physician and because there are "positive findings on claimant's lumbar MRI, and a September 2003 EMG which demonstrated L5 radiculopathy."

When evaluating an opinion by a treating physician concerning the severity and effects of severe medical impairments upon a claimant, the ALJ must follow a well-established standard in determining what, if any, weight to give to the opinion.  "Generally, the ALJ must give controlling weight to a treating physician's well-supported opinion about the nature and severity of a claimant's impairments."  Adams v. Chater, 93 F.3d 712, 714 (10th Cir. 1996).  Thus, the ALJ  "must first consider whether the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.'"  Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting SSR 96-2p, 1996 WL 374188, at *2).  "If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record....[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight."  Id.

"Under the regulations, the agency rulings, and [precedential] case law, an ALJ must give good reasons ... for the weight assigned to a treating physician's opinion" that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the  reason for that weight."  Id. at 1300 (quotations omitted).  A treating physician's opinion may be rejected if it is inconsistent with other medical evidence.  Castellano v. Secretary of Health & Human Servs., 26 F.3d 1027,

1029 (10th Cir. 1994).  See Kemp v. Bowen, 816 F.2d 1469, 1476 (10th Cir. 1987)("The treating physician rule governs the weight to be accorded the medical opinion of the physician who treated the claimant ... relative to other medical evidence before the factfinder, including opinions of other physicians.")(quotation omitted).  However, "[i]f the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." Watkins, 350 F.3d at 1301 (quotations omitted).

In his decision, the ALJ reviewed the medical evidence and Plaintiff's testimony and statements.  Based on this review, the ALJ found that Dr. Bentley's opinions were based more on Plaintiff's subjective statements rather than on objective medical findings. (TR 19). The ALJ noted that numerous clinical studies of Plaintiff had yielded normal results and that the "recent EMG study" which disclosed a possible L5 radiculopathy was "the only substantive indication that [Plaintiff] has any discernable physical problems." (TR 19).  The ALJ reasoned that Dr. Moorad's report was more thorough and better documented and that this consultative examiner had found no substantive objective medical evidence to support Plaintiff's complaints.  (TR 19).  Consequently, the ALJ afforded controlling evidentiary weight to Dr. Moorad's findings and to his opinion that Plaintiff is capable of performing sedentary work, including the secretarial occupation she previously performed.  (TR 19). Contrary to Dr. Bentley's findings on his RFC assessment, the ALJ found that Plaintiff "has demonstrated the ability to sit for reasonably lengthy periods" in light of her testimony regarding her daily activities and her ability to drive two hundred miles in one day. (TR 19). The ALJ also found "no basis to conclude that [Plaintiff] is incapable of lifting at least ten

16

pounds occasionally, or effectively using her hands" and that her ability to perform sedentary work requiring a certain amount of walking and standing was shown by her "activities of daily living." (TR 19).

The ALJ did not err in discounting Dr. Bentley's opinions because they were not supported by the objective medical evidence and were inconsistent with other medical evidence in the record. Dr. Bentley's office records consist of cursory and vague subjective statements by Plaintiff concerning her pain, little or no objective clinical findings, and no clear diagnoses at all with respect to the allegedly disabling impairments claimed by Plaintiff. The reports of consultative physicians who have examined Plaintiff and conducted extensive testing are inconsistent with Dr. Bentley's RFC assessment or multiple opinions concerning Plaintiff's ability to work. The ALJ summarized the objective medical evidence, and the ALJ's summary accurately depicted the medical record. Despite Plaintiff's continuing subjective pain complaints beginning in early 2001, all of the objective testing, including repeated EMG, MRI, nerve conduction studies, bone scan, blood, and laboratory testing, was normal except for the most recent EMG test of Plaintiff's lower extremities indicating possible L5 radiculopathy. Dr. Moorad, a pain management specialist, concluded after extensive medical examination and review of Plaintiff's medical records that she had a chronic pain syndrome which did not require further medical treatment, was not severe enough to require narcotic pain medication, and for which she needed to exercise and could return to her previous "office work" which she had performed until July 2001. (TR 118). Although Dr. Bentley prescribed physical therapy for Plaintiff, there is nothing in the record

showing that Plaintiff pursued this treatment modality after an initial evaluation in February 2001.  There is evidence in the record that Plaintiff reported to Dr. Bentley that the spinal steroid injections performed by Dr. Paige helped her cervical and shoulder pain, although she reported to Dr. Paige that the benefit was temporary.  Curiously, Plaintiff's complaints of shoulder, neck, and arm pain changed by early 2003, when Plaintiff began to complain of back and leg pain but no longer complained of upper extremity or neck pain. (TR 220-226). She reportedly stated to Dr. Bentley in June 2003 that her right arm was "still numb" but there is no notation of a complaint of continuing arm, shoulder, or neck pain, as she alleged in her application as the cause for her inability to work. (TR 220).

The only medical evidence relied on by Dr. Bentley to support his RFC assessment concerning Plaintiff's abilities to lift, carry, sit, and push or pull was an unspecified "NCVS," or nerve conduction velocity study, and an unidentified "Physiatrist's [sic] examination." (TR 233).  The nerve conduction tests of Plaintiff's lower extremities provide no support for the physician's assessment of lifting restrictions, and no objective medical evidence in the record supports these restrictions to lifting "less than 10 pounds." (TR 232).   With respect to Dr. Bentley's assessment that Plaintiff could sit for less than six hours in a workday, Plaintiff herself stated that she spends most of her days "sitting" and performing household maintenance activities such as laundry, washing dishes, dusting, and, according to the ALJ, reading.[1]  Dr. Bentley's office records also contain no objective findings consistent with his

_____

[1]The transcript of the Plaintiff's administrative hearing contains many blanks during Plaintiff's testimony.  However, the ALJ was present at this hearing, and it is assumed that the ALJ has correctly recited his personal observation of Plaintiff's testimony.

18

RFC assessment that Plaintiff's ability to sit is severely restricted.   In August 2001, Dr. Bentley noted after examining Plaintiff that her complaints of shoulder pain were due to a "chronic strain" of her trapezius muscle and that she also had chronic headaches and needed to stop smoking. (TR 171).  The only objective finding in this note was pain in Plaintiff's left thigh. (TR 171).  Dr. Bentley repeated his characterization of her shoulder pain as a chronic "strain of trapezius" muscle in October 2001. (TR 169).  Although Plaintiff complained intermittently of upper and lower back pain, examining physicians noted that her strength was normal (TR 108), that EMG and nerve conduction studies of her upper extremities showed no neuropathy or radiculopathy (TR 114, 134), that Plaintiff walked with a normal gait with no limping (TR 116), that she exhibited normal strength, no muscular atrophy, and no neurological deficits (TR 117), that MRI scans of Plaintiff's brain, shoulder, thoracic spine, lumbar spine, and cervical spine were normal (TR 118, 134, 135), that she had no objective or subjective evidence of reflex sympathetic dystrophy or complex regional pain syndrome (TR 118), that she needs a regular neck and back exercise program and only over-the-counter anti-inflammatory medication (TR 118), and that she was observed to move easily in and out of the chair and on and off the examination table and while ambulating the halls (TR 135-136). Plaintiff refers to some unspecified "positive findings" on a lumbar MRI scan in her brief but she fails to indicate where in the record this test is located.  Plaintiff may be referring to a consultative neurosurgeon's, Dr. Covington's, interpretation of an MRI scan of Plaintiff's lumbar spine as showing "modest changes...." (TR 135).  This same test was interpreted as being normal by another consultative examiner, Dr. Moorad. (TR 114).

Neither of these objective test results support the RFC assessment by Dr. Bentley or his opinions that Plaintiff is unable to work. Neither of these physicians recommended further treatment for an impairment of Plaintiff's lumbar spine, and no treating physician or consultative examiner diagnosed a severe back impairment as a result of this objective test. Although the most recent EMG study of Plaintiff's lower extremities conducted in September 2003 was interpreted as being "[c]onsistent with a R[ight-sided] L5 radiculopathy" (TR 228-229), Plaintiff's insured status expired on September 30, 2003, and there are no records of treatment of Plaintiff that would support the treating physician's findings that Plaintiff is completely unable to perform the exertional requirements of sedentary work due to this impairment. With respect to Dr. Bentley's assessment that Plaintiff's abilities to reach, lift, or handle objects were limited, Dr. Bentley refers only to Plaintiff's subjective complaints of pain in her neck and upper back with reaching. (TR 234). No objective medical evidence in the record provides support for these limitations, and the multitude of objective tests conducted with respect to Plaintiff's subjective complaints of upper body and neck pain were interpreted by medical specialists as showing normal results. In this case, the ALJ properly found that the extensive report of Dr. Moorad, an examining consultative physician, which was well supported by and consistent with other objective medical evidence in the record, was entitled to more weight than the RFC assessment by Dr. Bentley, which was not supported by and inconsistent with other objective medical evidence in the record. Accordingly, the ALJ did not err in disregarding Dr. Bentley's RFC assessment or his multiple statements that Plaintiff is unable to work.

V. Vocational Expert Testimony

Plaintiff contends that the ALJ erred in failing to obtain vocational expert testimony with respect to the availability of jobs for an individual with Plaintiff's severe impairments. However, Plaintiff first questions the credibility determination made by the ALJ concerning Plaintiff's allegation of severe, disabling pain. The ALJ found that Plaintiff's testimony and documentary statements were inconsistent and not credible to the extent that she alleged disabling pain.

At the fourth step of the evaluation process required of administrative factfinders, the ALJ recognized that he was required to determine whether the Plaintiff retains the RFC to perform the requirements of her past relevant work or other work that exists in significant numbers in the economy. At step four, the claimant bears the burden of proving her inability to perform the duties of her past relevant work. See Andrade v. Secretary of Health & Human Servs., 985 F.2d 1045, 1051 (10th Cir. 1993). At this step, the ALJ must "make findings regarding 1) the individual's [RFC], 2) the physical and mental demands of prior jobs or occupations, and 3) the ability of the individual to return to the past occupation, given his or her [RFC]." Henrie v. United States Dep't of Health & Human Servs., 13 F.3d 359, 361 (10th Cir. 1993). The assessment of a claimant's RFC necessarily requires a determination by the ALJ of the credibility of the claimant's subjective statements. "Credibility determinations are peculiarly within the province of the finder of fact, and [courts] will not upset such determinations when supported by substantial evidence." Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990). However, "[f]indings as to credibility

21

should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988)(footnote omitted).

To find that a claimant's pain is disabling, the "pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." Brown v. Bowen, 801 F.2d 361, 362-363 (10th Cir. 1986)(internal quotation omitted). "Subjective complaints of pain must be evaluated in light of plaintiff's credibility and the medical evidence." Ellison v. Secretary of Health & Human Servs., 929 F.2d 534, 537(10th Cir. 1990). In assessing the credibility of a subjective allegation of disabling pain, the ALJ must consider such factors as

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the province of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

Hargis v. Sullivan, 945 F.2d 1482, 1489(10th Cir. 1991); see Luna v. Bowen, 834 F.2d 161, 165-166(10th Cir. 1987).

As the ALJ reasoned, Plaintiff's testimony revealed that she was capable of driving two hundred miles in one day (TR 243-244) and that this testimony was consistent with the exertional requirements for sedentary work. The ALJ also relied on the numerous objective tests of Plaintiff's upper body and back showing normal results and Dr. Moorad's assessment that Plaintiff was capable of returning to her previous sedentary work, needed to exercise,

and needed only over-the-counter analgesic medication to treat her chronic right shoulder, neck, and back pain syndrome.  Plaintiff testified that she estimated she could sit for thirty minutes at a time.  However, the record contains a statement by Plaintiff that during the day she mostly sits, she performs household maintenance activities, she drives, she visits friends and relatives, and she grocery shops. The ALJ's recognition of the inconsistencies between Plaintiff's testimony and her other documentary statements concerning her activities are supported by the record.  Plaintiff complains that the ALJ failed to consider whether Plaintiff may have had to stop during her 100 mile trip to the administrative hearing.  However, Plaintiff was represented by counsel at the hearing, and counsel is presumed to have adequately developed the record concerning the relevant issues.    There is substantial evidence in the record to support the ALJ's credible determination, and it will therefore not be disturbed.

After reviewing the medical record, Plaintiff's statements in the record and testimony, and after finding that Plaintiff's allegations of disabling shoulder, neck, back, and leg pain were not credible, the ALJ concluded that Plaintiff has the RFC to perform sedentary work. This finding is supported by Dr. Moorad's report of his consultative examination of Plaintiff and the objective medical evidence in the record, including the reports of Dr. Dewitt and Dr. Covington, who are orthopedic surgeons.  Although Dr. Paige initially stated he thought Plaintiff would be capable of working at a sedentary job despite his diagnosis of a  complex regional pain syndrome, Dr. Paige subsequently declined to state with certainty whether Plaintiff would return to her previous job because of the brevity of his contacts with her.

This consultative physician's statements are, therefore, not supportive of or inconsistent with the ALJ's RFC finding.  Dr. Barnhill, another consultative orthopedic surgeon concluded after conducting an MRI of Plaintiff's right shoulder that she had no rotator cuff tear and thus no objective medical evidence of a shoulder impairment.   Although Plaintiff asserts that the ALJ needed vocational testimony with respect to the availability of jobs, this argument presupposes that Plaintiff's testimony regarding her ability to sit were fully credible.  There is nothing in the medical record to support the Plaintiff's subjective statement at her hearing that she could sit for only 30 minutes at a time.  As the ALJ reasoned, Plaintiff's own testimony at her hearing conflicted with her other documentary statements in the record concerning her daily activities.   Again without any evidentiary support in the record, Plaintiff asserts that vocational expert testimony was needed to address the availability of jobs for Plaintiff because her "chronic pain syndrome and chronic headaches" would necessarily affect her cognitive ability on the job. Plaintiff's Brief, at 6.  The ALJ did not err in failing to find that Plaintiff's RFC for work was limited by cognitive deficiencies as there is no objective medical evidence to support such a limitation.  There is substantial evidence in the record to support the ALJ's RFC finding, and no error occurred in this regard.

"An ALJ has no obligation to question a vocational expert if the claimant can return to past relevant work." Kepler v. Chater, 68 F.3d 387, 392 (10th Cir. 1995).  In this case, the record contained a sufficient description of Plaintiff's past work as a secretary to allow the ALJ to accurately characterize the exertional requirements of that work.  Plaintiff described two previous secretarial jobs as requiring standing or walking for three hours per day, sitting

for five hours per day, and lifting objects weighing less than ten pounds. (TR 71, 72, 105).

Accordingly, there is substantial evidence in the record to support the ALJ's conclusion that, considering Plaintiff's RFC for sedentary work, she retains the ability to perform her previous secretarial work, and the Commissioner's decision denying her application for benefits should be affirmed.

<u>RECOMMENDATION</u>

In view of the foregoing findings, it is recommended that judgment enter AFFIRMING the decision of the Commissioner to deny Plaintiff's application for benefits.  The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before ___February 9th_____, 2006, in accordance with 28 U.S.C. §636 and LCvR 72.1.  The parties are further advised that failure to file a timely objection to this Report and Recommendation waives their respective right to appellate review of both factual and legal issues contained herein. <u>Moore v. United States</u>, 950 F.2d 656(10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter.

ENTERED this ___20th_____ day of _____January_____, 2006.


GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE